STEPHEN L. PEVAR
American Civil Liberties Union Foundation
2074 Park Street
Hartford, Connecticut 06106
(860) 570-9830
*Pro Hac Vice* Application Pending

LEA C. COOPER
ISB # 3505
American Civil Liberties Union of Idaho
P.O. Box 1897
Boise, Idaho 83701
(208) 344-9750 ext. 206

DEAN JOSEPH MILLER
ISB # 1968
Cooperating Attorney, American Civil Liberties
Union of Idaho Foundation
McDevitt & Miller LLP
P.O. Box 2564
Boise, ID 83701
(208) 343-7500

Attorneys for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| AMANDA DAVIS, ALISHA BAKER, TROY FENSTER, DESIREE COMINGO, PARNELL WILLIAMS, and PEDRO MARTIN, individually and on behalf of all other persons similarly situated,<br><br>                    Plaintiffs,<br><br>vs.<br><br>CANYON COUNTY, IDAHO, by and through the members of its Board of County Commissioners, KATHY ALDER, DAVID FERDINAND, and STEVEN RULE, each sued in his or her official capacity; and  CHRIS SMITH, in his official capacity as Sheriff of Canyon County.<br><br>                    Defendants. | Case No.<br><br>CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF |

## INTRODUCTION

The six named plaintiffs file this action on their own behalf and on behalf of a class of all other persons incarcerated, now or in the future, in the Canyon County Jail in Caldwell, Idaho.  Plaintiffs seek declaratory and injunctive relief from conditions of confinement that are indecent, cruel, and inhumane.  For years now, as defendants' own reports show and as repeated inspections from the Idaho Sheriff's Association detail, defendants have been incarcerating far more persons in the Dale G. Haile Detention Center--the largest of the three structures comprising the Canyon County Jail--than it was designed to hold.  The Jail also suffers from inadequate ventilation; inadequate temperature control; inadequate fire protection; inadequate recreation; inadequate plumbing; inadequate medical care; and inadequate sanitation.  In addition, Defendants invidiously discriminate against female prisoners in the operation of the Jail's work release and inmate worker programs.  Relief is sought pursuant to the Eighth and Fourteenth Amendments to the U.S. Constitution.

## JURISDICTION AND VENUE

1.   This action arises under the Eighth and Fourteenth Amendments to the U.S. Constitution and 42 U.S.C. §1983.  Jurisdiction exists pursuant to 28 U.S.C. §§1331 and 1343(a)(3) and (4).  Venue is properly found in this District pursuant to 28 U.S.C. §1391(b), in that all parties reside, and plaintiffs' claims arose, within the District.

## PLAINTIFFS

2.   Plaintiffs Amanda Davis, Alisha Baker, Troy Fenster, Desiree Comingo, Parnell Williams, and Pedro Martin are adult citizens of the United States currently incarcerated in the Canyon County Jail.

## THE PLAINTIFF CLASS

3.  This action is brought on behalf of the named plaintiffs and on behalf of all other persons incarcerated in the Canyon County Jail, or who may become so incarcerated in the future.  Class certification is sought pursuant to F.R.Civ.P. 23(a), (b)(1) and (b)(2).  Class certification is appropriate because the members of the class are so numerous that joinder of all persons is impracticable; there are questions of fact and law common to the class; the representative parties' claims are typical of the claims of the class; and the named plaintiffs will fairly and adequately represent the interests of the class.  In addition, the defendants have acted or refused to act on grounds generally applicable to all members of the class, thereby making appropriate final declaratory and injunctive relief to the class as a whole, and the questions of law or fact common to members of the class predominate over any questions affecting individual members.

## DEFENDANTS

4.  Canyon County, Idaho, is a county organized and existing pursuant to Title 31, Idaho Code.  The County is amenable to suit through its Board of County Commissioners, whose members are defendants herein--Kathy Alder, David Ferdinand, and Steven Rule--each of whom is sued in his or her official capacity.  The Board of County Commissioners is charged under Idaho law with the responsibility to maintain a safe, adequate, and secure jail.  *See* Idaho Code § 20-622.  Idaho Code § 20-612 states that the board must "furnish all persons committed to the county jail with necessary food, clothing and bedding, and medical care" and further provides that the board "is authorized to pay" for these provisions from the county treasury.

5.   Defendant Chris Smith is the duly elected Sheriff of Canyon County, Idaho, and as such has a duty under state and federal law to adequately administer the county jail and provide for the proper and humane care, custody, and control of the named plaintiffs. Defendant Smith is sued in his official capacity.

## STATEMENT OF FACTS

6.   The Canyon County Jail in Caldwell, Idaho, consists of three buildings called the Annex, the Dale G. Haile Detention Center, and the Work Release Center.

7.   The Annex, built in 1948, was abandoned in 1993 when the Dale G. Haile Detention Center was opened.  However, due to overcrowding in the Detention Center, the Annex was somewhat refurbished and reopened in 2001.  Due to its many violations of Idaho Jail Standards, the Annex was closed in 2006.  In March 2007, the Annex was reopened after receiving some limited refurbishing and now houses approximately 70 prisoners.  Although Sheriff Smith believes that the Annex should be closed permanently, the county currently uses this structure to house segregation prisoners on one floor and prisoner workers and minimum security prisoners on two other floors.

8.   The Dale G. Haile Detention Center was built in 1993 and houses the majority of the Canyon County prisoners, both male and female, on its two floors.  The Detention Center has four pods: Pod 1 contains housing units A, B, C, and D; Pod 2 contains units E, F, and G; Pod 3 contains units H, J, K, and L; Pod 4 contains units M and N.

9.   Originally, most or all bunk beds in the Detention Center were double bunks. Over the years, however, the defendants converted many of these double bunks into triple bunks.  The Detention Center now contains some 488 beds.

10.  Yet even with these 488 beds in the Detention Center, there frequently have been more prisoners than beds.  Throughout 2008, scores of prisoners had to sleep on the floor--often for weeks or months--due to the lack of an available bunk bed.

11.  Each unit in each pod in the Detention Center has a common area with eating tables and benches on one side, and a partitioned area on the other side with shower stalls, sinks, and toilets.  The Detention Center also contains on its first floor a booking and holding area that includes cells for medical isolation and suicide watch prisoners, and a cell for prisoners who arrive at the jail intoxicated.

12.  In 2006, a 216-bed Work Release Center for male prisoners was opened.  Due to overcrowding in the Detention Center, the Work Release Center houses some general population prisoners as well as prisoners on work release.

**Overall conditions of the Dale G. Haile Detention Center**

13.  Yearly inspection reports issued by the Idaho Sheriff's Association (ISA) detail the substandard, filthy, and unhealthy conditions of confinement in the Dale G. Haile Detention Center.  The root cause of these deplorable conditions is overcrowding.  Overcrowding produces a "domino effect," taxing all other systems--ventilation, plumbing, staffing, laundry, recreation, etc.--beyond the breaking point.  The 2007 ISA report, issued August 28, 2007, reaches that conclusion.  The ISA determined that "overcrowding would seem to be the inherent problem that creates security issues, tasks the staff and the physical plant [and] makes it very difficult to keep up maintenance, cleaning and refurbishment of the facility."  The report noted that persistent overcrowding, including the "flooring and multi-bunking" of prisoners, is "the basis for the liability that the County shoulders and an ongoing reason for concern."  The ISA's

2008 inspection report, issued on June 11, 2008, reiterated that conclusion.  The report found that cells in the Detention Center "were considerably overcrowded" and "were very humid and smelled."  Inspectors found "mold, scaling of paint, and fixtures that were not working or needed cleaning and refurbishment in numerous cells."  The inspection concluded that the "ventilation systems cannot move enough air" for the population, and that overcrowded conditions throughout the Detention Center makes it "impossible to do routine maintenance, painting and repairs, . . . [and] increase[s] the likelihood of mold and other airborne problems."  The combined effect of these substandard conditions, the ISA concluded, compromises the health and safety of staff and prisoner alike.  This is not to say that reducing the jail's population would be a panacea--because it would not--but it certainly would alleviate some problems.

**1.  <u>Overcrowding</u>**

14.  Sheriff Smith and the County Commissioners have acknowledged that the Dale G. Haile Detention Center is overcrowded.

15.  The Idaho Sheriff's Association (ISA), comprised of correctional and law enforcement officers from around the state, has promulgated a set of standards to govern the operation and administration of local jails.  One set of standards, adopted from the American Correctional Association (ACA), is used to determine the number of beds that may safely and securely be placed in a given space.  A recent study conducted by Sheriff Smith found that in order to comply with those ISA standards, at least *100 beds* must be removed from the Detention Center.

16.  On December 15, 2008, Sheriff Smith admitted in a letter to the ISA that "we have too many inmates to meet [the ISA living space] standard."

17.    During the past twelve months, named plaintiffs Amanda Davis, Alisha Baker, and Parnell Williams each had to sleep on the floor due to overcrowding in the Detention Center.  Ms. Davis, who was nearly five months pregnant at the time, was required to sleep on the floor for nearly three weeks.

18.    As a result of chronic overcrowding, the Detention Center is not able to adequately classify prisoners.  Thus, prisoners who should be kept apart for various reasons, such as age, crime, their predatory nature or their predilection for violence, often must be housed together.  This increases the risk of violence, intimidation, and strong-arming.  Overcrowding also contributes to all of the other inadequacies discussed below.

## 2. Inadequate ventilation

19.    Standards issued by the ACA, the American Public Health Association, and the American Society of Heating, Refrigeration and Air Conditioning require regular and constant intake of fresh or outside air to prevent the spread of respiratory infections, reduce odors, and dilute exhaled carbon dioxide.  Respiratory secretions from an individual with an infection of the respiratory tract contaminate both surrounding surfaces as well as infuse the air with tiny, droplet nuclei.  Adequate ventilation is necessary to remove airborne contaminants.

20.    Ventilation in the Detention Center is inadequate, resulting in a build-up of stale and foul air and increasing the risk of air-borne disease, headaches, dizziness, and other physical and mental ailments.  The ISA's 2008 inspection report, as noted above, found that the Detention Center's ventilation system "cannot move enough air" for the population, and that cells were "very humid and smelled."   The Center's ventilation

system was not designed to accommodate the size of this prisoner population, and it is simply unable to meet their need for fresh and clean air.

21.    Numerous prisoners, including named plaintiffs Amanda Davis, Parnell Williams, Alisha Baker, and Desiree Comingo, report suffering headaches and dizziness that they attribute in part to inadequate ventilation.  Ms. Davis has repeatedly asked deputies to improve the air quality, only to be told on each occasion that there is nothing they can do to improve it.  The living units in which they are confined are humid and stink due to inadequate ventilation.

22.    When class plaintiff Misty Canada recently complained to a guard about the foul air in her living unit, the guard replied: "Well, obviously you're still breathing." Nothing was done to improve the air quality.

23.    Inadequate ventilation contributes to the spread of mold, a problem that plagues the Detention Center, as discussed below.

**3.  Inadequate sanitation**

24.    Unsanitary conditions exist throughout the Dale G. Haile Detention Center, as well as the Annex and Work Release Center.  Mold and soap scum exist in virtually every shower area.  In some housing units, the humidity is so high and ventilation so poor that water droplets form on ceilings, and the Sheriff has installed plastic bags to catch the falling water and paint flakes.  Mold and mildew are visible on shower stalls, walls, and ceilings.  Concrete is deteriorating due to water damage.

25.  In late February 2009, class plaintiff Sabra McGinnes submitted a grievance calling attention to the mold growing on the floor, ceiling, walls, and inside the showers.

The shift supervisors responded: "Maintenance is aware of this issue."  Indeed, Maintenance has been aware of the issue for years and has failed to remedy it.

26.  There is no adequate or routine cleaning of shower and toilet facilities, and as near as plaintiffs can discern, there is no housekeeping plan to prevent the build-up of filth.  Sheriff Smith acknowledged in his December 15, 2008 letter to ISA: "Facility sanitation and maintenance in regard to a written housekeeping plan is not in place."

27.  In late 2008, prisoner Kathaleena Bowen, unable to stand the stench emanating from the drain in the shower area in her housing unit, obtained the help of Deputy Atkinson in removing the drain cover.  Seeing the filth and gunk that filled the drain, both of them vomited.  They then cleaned the drain.

28.  In late 2008, named plaintiff Troy Fenster and another prisoner were given some cleaning supplies by a deputy and told to remove the mold in G-Unit.  However, the mold was so encrusted on walls, ceilings, and floors, and the materials they were given were so inadequate, that their efforts barely made a difference, and three days later the mold was just as evident.  (Moreover, the deputy failed to issue these men protective clothing, eyewear, or masks, despite the toxic nature of black mold spores.)  Today, the mold is G-Unit remains as bad as it ever was.

29.  Prisoner Curtis Jay Miller was selected by guards to be a janitor.  Mr. Miller will testify that not once during nearly six months of his work was he instructed to try and clean the mold, nor was he given proper equipment with which he could clean the mold.  Mold was and is rampant throughout his housing area.

30.  Named plaintiffs Amanda Davis and Desiree Comingo are allergic to mold.  Both women have had trouble breathing the air in their housing units.  Ms. Comingo,

who uses an inhaler, uses three times the number of inhalers inside the jail than normal due to the unhealthy build-up of mold in her housing unit.

31. Ms. Davis believes that not once since December 19, 2008 have guards sought to clean, or supervised prisoners in the cleaning of, mold in her housing unit.

32. On February 20, 2009, named plaintiff Alisha Baker submitted a grievance stating that only once during the past week was a disinfectant brought into the housing unit for the prisoners to use. She received a reply from the administration stating that "cleaning supplies will be offered when convenient for [employees], not you." Apparently, it has been very inconvenient for guards to provide prisoners with adequate cleaning supplies.

33. In late 2008, prisoner Nikki Price spent ten days in a cell in the Annex. The cell in which she was placed had someone else's blood caked on the walls. The cell also had water continually oozing down one wall. When Ms. Price asked a deputy for a rag to dry the resulting puddle on the floor, she was told to use her own towel, the one intended for her showering and washing.

34. The jail issues each prisoner one towel twice a week. Numerous prisoners will testify that the towels they receive smell of body odor.

35. The jail issues each prisoner an orange jumpsuit twice a week, meaning that prisoners wear the same clothing three and then four days in a row. This results in an accumulation of body odor in the clothing, which permeates the air. Jumpsuits become so soiled and smelly that they are difficult to get clean and fresh-smelling.

36.  Class plaintiff Traci Jennings recently told a guard that her laundry had not been properly cleaned and still smelled.  The guard replied: "You're a piece of crap.  You don't deserve clean stuff."

37.  In addition to the presence of mold throughout the Detention Center, there is a constant flaking of paint in several housing units, including the units occupied by named plaintiffs Davis, Baker, and Comingo.

38.  Several prisoners, including class plaintiffs Misty Canada and Jamie Neider, will testify that on occasion they have been issued shaving razors with hair lodged between the blades, indicating that these razors had been used previously.  Class plaintiff Sabra McGinnes received a razor with what appeared to be blood on it.

39.  Numerous prisoners suffer from a continuous series of influenza-like symptoms due to the unhealthy and unsanitary conditions in the jail.  Named plaintiff Troy Fenster has had one cold after another while in the jail, even though he rarely gets sick otherwise.  Prisoner Curtis Jay Miller has been healthy virtually all his life and was healthy when he entered the jail eight months ago.  However, since his admission to the jail, he has been ill most of the time, suffering flu-like symptoms.  Class plaintiff Ronda Luna has suffered similarly.  She even lost her job as an inmate worker because she kept getting sick.

**4.  <u>Inadequate plumbing</u>**

40.  There is no adequate or routine maintenance of plumbing systems, including shower and toilet facilities, and the jail is beset with plumbing problems that create health and safety hazards.

41.  Due to overcrowded conditions, showers and toilets in the Detention Center receive far more use than originally designed, and they frequently break down.  Many of these broken facilities have remained unusable for weeks or months at a time.  For instance, G-Unit contains 92 beds.  (According to the Sheriff's recent study, it should have only 66 beds.)  Named plaintiff Troy Fenster resides in G-Unit.  Mr. Fenster will testify that as many as five of the ten showers in the unit have been inoperable for weeks at a time, and two of the nine toilets were inoperable for three months.

42.  All six named plaintiffs will testify that the housing units in which they reside have plumbing problems, such as clogged drains; standing, stagnant water; and/or water dripping from ceiling pipes onto the floor and dining tables.  Some prisoners, including plaintiff Fenster, have seen bugs crawling out of the water.

43.  Showers throughout the Detention Center have two buttons that must be pushed for water, one for hot water and the other for cold.  They do not operate simultaneously, and prisoners must decide whether to be doused with hot or cold water while showering.  Sometimes the hot water is so hot it scalds the skin instantly.  Named Plaintiff Comingo is one of the prisoners scalded during a shower.

44.  Class plaintiff Jamie Neider will testify that he was an inmate worker in the Detention Center's kitchen for several months.  During that time, leaking water was allowed to stand underneath the walk-in refrigerator/freezer and it had a horrible odor.

**5.  Inadequate temperature control**

45.  Plaintiffs will testify that the housing units in which they currently reside in the Detention Center are very cold, especially at night.  Parnell Williams will testify that while he was in F-Unit, it was so cold that his hands turned blue.  Named plaintiff

Amanda Davis will testify that she and other female prisoners often ask deputies to raise the temperature, only to be told that there is nothing the deputies can do about it.  Named plaintiff Troy Fenster will testify that one reason he believes he keeps getting sick in the jail is because of the cold temperatures.  Former prisoner Eric Couch will testify that he believes his chills, his raspy voice, and the green mucous he was expectorating for some five weeks was due to the frigid temperatures in his housing unit.

46.  Many prisoners wrap themselves in blankets in the morning because it is so cold in their living units.

47.  On occasion, and for reasons unknown to Plaintiffs, the temperature inside the jail during winter days will suddenly spike so that it is uncomfortably hot, but it is mostly cold.

48.  Prisoners who have been incarcerated in the Detention Center during summer months report that the jail is often uncomfortably hot, and prisoners sweat even when they are inactive.  In addition, the hot temperatures cause the mold to grow faster.

**6.  <u>Inadequate bedding</u>**

49.  Bedding in the jail falls below acceptable standards, especially given the cold temperatures in the housing units during winter months.  Defendants issue one thin mattress per prisoner to be placed over a metal bunk bed, a mattress cover, a sheet, and two thin blankets.

50.  Pillows are not issued to prisoners.

51.  The blankets issued to prisoners are not sufficient to keep them warm during the winter months.  All six named plaintiffs will testify that they are uncomfortably cold at night because they do not have sufficient blankets.

52.   Defendants maintain a rigid policy of not issuing a third blanket even when prisoners request one from a deputy or through the medical department.  On November 20, 2008, for instance, prisoner Nikki Price submitted the following written request to the medical department of the Detention Center: "Can I please get an extra blanket. Thanks." The following day she received this written response: "Only 2 blankets are given."

53.   Most or all of the mattresses in the Detention Center are cracked, and many have large holes that expose their stuffing.  This prevents these mattresses from being properly cleaned and sanitized, and Defendants do not even try to clean and sanitize them.  When a prisoner leaves the jail, his/her mattress is stacked on a pile and reissued to an arriving prisoner.  Former prisoner Rochelle Saucedo will testify that she stacked nearly 100 mattresses during the eight months of her incarceration, and not one of them was cleaned or sanitized prior to being reissued.

54.   Prisoners are not permitted to have a second mattress even when medically indicated.  Named plaintiff Amanda Davis was nearly five months pregnant when she entered the Detention Center.  No bed was empty, so a deputy assigned her to a place on the cold cement floor, and she was issued one thin mattress.  She requested a second mattress but was refused.  Even the jail's medical department refused to authorize the issuance of a second mattress, informing Ms. Davis that pregnant women qualify for a second mattress only when they enter their third trimester.  Ms. Davis will testify that sleeping on one thin mattress caused bruising on her hips and made prolonged sleep impossible.  At the time Ms. Davis was denied a second mattress, the jail had dozens of additional mattresses piled in the store room.

55.   Prisoners will testify that in 2008 another pregnant prisoner, besides Ms. Davis, spent many days on the floor and was denied a second mattress even though she complained of severe back pain and submitted medical requests.

56.   Numerous prisoners, including named plaintiffs Parnell Williams and Pedro Martin, have developed back, neck, or shoulder problems because the jail refuses to issue them adequate bedding.

57.   Named plaintiff Alisha Baker will testify that as a result of a car accident, she had four broken ribs and a fractured collar bone and that she gave the name of her doctor to the jail's medical department when requesting a second mattress.   Ms. Baker believes that the jail did not contact her physician and simply denied her a second mattress.   As a result, Ms. Baker has difficulty sleeping and experiences back pain.

**7.   Inadequate recreation**

58.   The Detention Center has no indoor recreation facility.

59.   The Detention Center has no designated exercise equipment for aerobic or anaerobic exercise located either indoor or outdoor.

60.   The Detention Center has two outdoor recreation yards.   However, deputies rarely permit prisoners to use them.   There are no scheduled times of recreation, and access to the yard is wholly within the discretion of the deputy on duty.   Prisoners in G-Unit will testify that during the last three months of 2008, they were offered access to the recreation yard on only two occasions.

61.   Prisoners often ask deputies to be allowed access to the yard but such requests are routinely denied.   Plaintiff Alisha Baker will testify that she spent six weeks

in segregation without once being offered an opportunity to use a recreation area, either indoor or outdoor.

62.  During the winter months when it is cold outside, the Detention Center only has a few zippered sweaters available for prisoner use in the recreation yard.   In December 2008, during the one time that a deputy offered outdoor recreation to G-Unit, some thirteen prisoners went outdoors.   They were given only five sweaters between them, and the zippers of three of the five were inoperable.   The thirteen prisoners shared the sweaters, handing them back and forth while they walked around the yard.

63.  There is no exercise equipment in the outdoor recreation yard.  A few months ago when some prisoners in G-Unit fashioned a ball from a rolled-up pair of socks and were using it in the recreation yard in order to create some form of athletic activity, the deputy on duty--for no legitimate penological reason--ordered them to stop.

64.  The lack of equipment for aerobic exercise and for large muscle activity causes unnecessary pain and suffering, muscle atrophy, and lethargy.   It results in enforced idleness.  Named plaintiffs Baker and Martin, both of whom engage in regular exercise on the outside, have noticed a drop in their physical health since being confined in the Detention Center.   Named plaintiff Williams will testify that his doctor recommended that he exercise regularly due to a medical condition, but the Detention Center offers no realistic opportunity for him to do so.

65.  At least one of the outdoor recreation yards is also used to house K-9 dogs. These dogs urinate and defecate in the yard.   On several occasions, prisoners have entered the yard and found dog feces still present.

**8.  Inadequate staffing**

66.  The County Commissioners have repeatedly denied requests from Sheriff Smith for additional staffing in the jail.

67.  The jail is inadequately staffed.  Employees of the jail have publicly admitted this, as well as acknowledged the overall substandard conditions in the Detention Center. *See* http://www.idahopress.com/?id=20318. (Attached as "Exhibit 1").

68.  On many shifts, not only is there an insufficient number of deputies on duty but the jail must rely on staff working overtime, and deputies often are short-tempered and tired.  This creates a dangerous condition for staff and prisoner alike.

69.  The Detention Center and the Annex are staff-intensive facilities, having linear designs and many "blind spots" that require officers to visit personally (rather than observe from a central post) at least once every half-hour.

70.  The lack of adequate staffing increases the risk of prisoner-on-prisoner violence.  In recent months, for instance, named plaintiff Martin was present when another prisoner was beaten so badly that brain matter was released from his head.  Due to staffing shortages, deputies were unable to arrive in time to protect this prisoner.

71.  Housing units have "panic buttons" that prisoners may push in case of emergency.  However, employees rarely respond when the buttons are pushed.  Class plaintiff Sabra McGinnes will testify, for instance, that a deputy told her that he will ignore the button and will simply conduct his half-hourly inspections.

**9.  Inadequate fire protection**

72.  An inspection by the fire department of the Detention Center's fire alarm system in January 2008 found "3 ground faults at the time of inspection, which will

hamper system performance; as well as over thirty troubles.  System needs further service . . . which may include panel and/or device replacement along with extensive rewiring and programming."

73.  Only in recent weeks have the defendants begun to install some type of fire protection system.  Plaintiffs do not know if installation of this system has been completed or what type of system it is.

74.  To plaintiffs' knowledge, defendants have not had a fire drill in the Detention Center in years, not even one in which prisoners remain in their cells in a mock release.

**10.  Arbitrary rule enforcement**

75.  Various deputies have told prisoners that an Inmate Handbook exists.  However, few prisoners have seen it.  A copy is not distributed to prisoners on intake and the Handbook is not posted anyplace.  Prisoners will testify that either they or other prisoners in their presence have requested to see an Inmate Handbook, and one was not given to them.  Named plaintiff Pedro Martin has been denied several times.  Some prisoners were given incomplete Handbooks.

76.  As a result, prisoners do not know what conduct is proscribed or what punishments may be imposed for any of these unidentified infractions.  Deputies appear to have virtually free reign in setting rules and enforcing them.

77.  Former prisoner Nikki Price will testify, for instance, that she was given forty days in segregation for engaging in an activity she did not know was a rule violation.  Named plaintiff Alisha Baker will testify that ever since she began writing to the ACLU, she has been found to have violated rules she did not even know existed and given severe punishments, including lengthy sentences to segregation.

**11.  Failure to ensure the provision of special meals**

78.  Named plaintiff Amanda Davis will testify that she has repeatedly notified jail personnel that she has a severe allergic reaction to onions, such that her throat will close and she will have difficulty breathing and swallowing.  Yet on every occasion in which onions are served as part of the prisoner meal, deputies have brought her that same meal.

79.  Other prisoners have reported similar problems.  Former prisoner Viola Quintana repeatedly informed jail personnel that she is allergic to fish, but whenever fish was served to everyone else, she was given the same meal.

**12.  Inadequate medical care**

80.  Several prisoners report positive experiences with the jail's medical department, but other prisoners report negative experiences.  Those with negative experiences include the two pregnant prisoners, one of whom is named plaintiff Davis, who were denied a second mattress even after requesting them for medical reasons.

81.  An overall problem faced by the prisoner class is that the jail charges prisoners a fee of $10 each and every time they are seen by the medical department and an additional $5 for each medication, even for medication, such as cold tablets, that do not cost $5 to procure.  (Prisoners who do not have money on their books are given a "negative" balance, and the money is seized as soon as it is placed on the prisoner's account.)  Plaintiffs will testify that $10 is a lot of money to them, and that this charge has resulted in their sometimes not requesting needed medical attention.  As a consequence, prisoners remain contagious in their housing units, thereby placing the entire prisoner population at unnecessary risk of infection and disease.

82.  It is particularly unconscionable to charge prisoners a fee to obtain medical care for illnesses and infections caused by the jail's own failure to provide a safe and healthy environment.  The jail is making people sick and then charging them a fee to get well.  Scores of prisoners have been treated for colds, skin infections, headaches, backaches, and other ailments they contracted *only* because of squalid conditions in the jail and have been charged by the jail for treatment.  Among the prisoners impacted in this manner are named plaintiffs Troy Fenster, Alisha Baker, and Parnell Williams.

**Inadequate training and supervision**

83.  Defendants have a duty to adequately train jail personnel and supervise their behavior.  It is clear that this is not occurring.  Examples are legion of guards making rude and inappropriate comments to prisoners and engaging in the same misconduct repeatedly.

84.  For instance, guards often use profanity while speaking to or criticizing prisoners.  Recently, when one prisoner mentioned that the ACLU would be conducting interviews, a guard replied: "Just because the ACLU is here doesn't mean shit to us." Class prisoner McGinnes was told by one deputy that prisoners are "animals."

85.  Named plaintiff Troy Fenster watched while one guard slammed a prisoner's head into a glass wall and then announced to all the other prisoners that the same thing will happen to them if they don't follow his orders.

86.  Class plaintiff Jamie Neider watched as one deputy in the kitchen deliberately poured boiling water on a prisoner's foot, telling him that this was the way to clean his shoes on which some jello had fallen.

87.   Additionally, guards have suggested that a link exists between a prisoner's loss of a privilege and his or her having complained about deplorable conditions in the jail.  Named Plaintiff Desiree Comingo was told by a guard on March 2, 2009 that she might have lost her inmate worker position because she had filed grievances complaining about jail conditions.

88.   Guards have also sought to discourage prisoners from submitting grievances. Recently, when named plaintiff Amanda Davis and other female prisoners requested grievance forms to complain about the cold temperatures in their housing unit, guards initially refused to provide the forms and asked the women if these were being requested because of the ACLU lawsuit.  When named plaintiff Alisha Baker requested a grievance form, a guard asked her if she had "joined the ACLU bandwagon."  One officer, Sgt. Moore, told a prisoner who had complained about conditions in the jail: "If you don't like the way this jail is run, bond out."

89.   Named plaintiff Parnell Williams suffers from sleep apnea, and sometimes snores loudly.  On one such occasion, a guard placed his radio next to Mr. Williams' face and broadcast his snoring throughout the housing unit.  Numerous prisoners complained about this and later ridiculed Mr. Williams.  When Mr. Williams grieved this misconduct, guards denied it had occurred.  An adequate investigation was not conducted and the incident was covered up by administrative staff.

90.   Recently when named plaintiff Baker left her cell for an interview with her attorneys in this litigation, two guards immediately entered her cell and, as other prisoners later told Ms. Baker, began examining her legal mail.  When Ms. Baker returned to her cell, her correspondence was displaced and disheveled.

**Sex discrimination against female workers**

91.   Defendants provide an opportunity for prisoners, both male and female, to earn special privileges by working.   There are two such programs.   The first is "Work Release," in which prisoners leave the jail and work at another location.   The second is "Inmate Worker," in which prisoners work at locations within the jail.

92.   In both of these programs, Defendants invidiously discriminate against female prisoners.

93.   For instance, male prisoners on Work Release live in the relatively new Work Release Center and enjoy numerous privileges and benefits, whereas female prisoners on Work Release live in the Annex and have almost none of those privileges.   The men, for instance, have access to a TV, radio, DVDs, have regular access to a pay phone, more comfortable clothing, and are allowed to wear tennis shoes.   Women on work release have *none* of these privileges.   Moreover, on Sundays, the men are allowed to go home for a period of time, but the women are not.

94.   Male Inmate Workers are permitted to live in the Work Release Center and participate in extra benefits and privileges that are denied female Inmate Workers.

95.   Plaintiff Desiree Comingo was an Inmate Worker for nearly two months. While her male counterparts were enjoying numerous privileges at the Work Release Center, Ms. Comingo was forced to live in her usual housing unit and enjoyed none of those privileges.

**Defendants' deliberate indifference**

96.   Each defendant has made statements acknowledging that the Canyon County Jail is overcrowded and is beset with health and safety problems.   It is well known that

human beings confined in a sordid environment like the one that exists in the Dale G. Haile Detention Center will suffer predictable physical and mental illness over time, including disease, aches, pains, depression, listlessness, apathy, sleeplessness, anxiety, and tension, and will be at unnecessary risk of violent assault from persons whose existing problems are exacerbated by conditions of confinement of this nature.

97.   Defendants have it within their power--and they have it within their duty--to take all reasonable steps to prevent the suffering that they know is occurring on a daily basis in the Dale G. Haile Detention Center.  Their failure to take those steps reflects deliberate indifference to the health and safety of the prisoner class and subject the plaintiff class to cruel and unusual punishment.  Unless and until this Court intervenes and orders the cessation of these intolerable and dangerous condition, plaintiffs will continue to suffer unnecessary harm.  Plaintiffs have no adequate remedy at law.

**Very recent improvements to the Jail**

98.   During the past several months, there have been numerous letters and telephone calls between prisoners of the Canyon County Jail and the American Civil Liberties Union (ACLU).  On November 13, 2008, the *Idaho Press-Tribune* reported that the ACLU was considering filing suit against Canyon County in order to improve conditions in the county jail.  Within the past 120 days, defendants have suddenly made a concerted effort to improve a few conditions in the Dale G. Haile Detention Center.  For instance, some (but not all) of the housing units were painted, and work commenced on a new fire alarm system.

99.  These efforts are commendable, but they are too little and too late to avoid the need for judicial intervention.  In the first place, most of the inadequacies described

above will remain unabated.  Second, based on past history, it must be presumed that defendants' remedial efforts are temporary and transitory.  As the Supreme Court stated in a related context, "[i]t is the duty of the courts to beware of efforts to defeat injunctive relief by protestations of repentance and reform, especially when abandonment seems timed to anticipate suit, and there is a probability of recurrence." United States v. Oregon State Medical Society, 343 U.S. 326, 333 (1952).  *See also Battle v. Anderson*, 708 F.2d 1523, 1538 (10th Cir. 1983) (holding that a federal court must issue injunctive relief against prison officials, despite their recent remedial efforts, "until it can say with assurance that the unconstitutional practices have been discontinued and that there is no reasonable expectation that the unconstitutional practices will recur."

100.   On October 20, 2008, Sheriff Smith sent a letter to the Canyon County Commissioners that stated: "All present factors such as the economy, political agendas and county planning indicate that the Dale G. Haile Detention Facility is going to be open for several more years as the main Canyon County inmate detention facility.  With this being the case, it is necessary that a large scale renovation of the facility be put into action.  The approach can not be just to get by, which appears to be the past standard of operation as evidenced by the condition of the facility."  No such "large scale renovation" is taking place.

## FIRST CLAIM FOR RELIEF

101.   Some prisoners incarcerated at the Canyon County Jail are pretrial detainees, that is, they have not been convicted of any offense and the only reason they are incarcerated is because they are unable to post bond.  For reasons set forth above, Plaintiffs allege that the actions of defendants, separately and in combination, acting

under color of state law, has caused members of the plaintiff class not yet convicted of any crime to suffer punishment without due process of law in violation of rights secured to them under the Fourteenth Amendment to the Constitution of the United States.  Relief is sought pursuant to 42 U.S.C. § 1983.

## **SECOND CLAIM FOR RELIEF**

102. In addition to pretrial detainees, some members of the plaintiff class have been convicted of a crime and are incarcerated as a result, either as a county prisoner or as a state prisoner.  For reasons set forth above, the actions of defendants, separately and in combination, in incarcerating members of the plaintiff class who have been convicted of crimes under the conditions described herein, subjects them to cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments to the Constitution of the United States.  Relief is sought pursuant to 42 U.S.C. § 1983.

## **THIRD CLAIM FOR RELIEF**

103.  For reasons set forth above, female prisoners are being denied equal opportunity and benefits in Defendants' Work Release and Inmate Worker programs solely on the basis of their sex.  Such discrimination violates rights secured to female prisoners by the Fourteenth Amendment to the Constitution of the United States.  Relief is sought pursuant to 42 U.S.C. § 1983.

## **PRAYER FOR RELIEF**

WHEREFORE, plaintiffs pray to this Court as follows:

1.  Assume jurisdiction over this matter;

2.  Certify this action as a class action pursuant to Rule 23(a), (b)(1) and (b)(2), F.R.Civ.P.;

3.   Issue a declaratory judgment that defendants' actions violate rights secured to plaintiffs under the Eighth and Fourteenth Amendments to the United States Constitution;

4.   Issue injunctive relief pursuant to Rule 65 F.R.Civ.P., enjoining defendants and all persons in concert with them, and their successors in office, from incarcerating plaintiffs in the Canyon County Jail in a manner that violates their federal rights; and

5.   Grant plaintiffs their costs and attorneys' fees in this matter, and such other and further relief as to the Court may seem just and proper.

DATED this 11th day of March, 2009.


_____//s//_____
Dean J. Miller
Stephen L. Pevar
Lea C. Cooper

Attorneys for the Plaintiffs